In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-1621

LANA CANEN,

*Plaintiff-Appellant,*

*v.*

DENNIS CHAPMAN, in his individual
capacity as Deputy for the Elkhart
County Sheriff Department,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 3:14-cv-00315-RL — **Rudy Lozano**, *Judge.*

ARGUED SEPTEMBER 23, 2016 — DECIDED JANUARY 27, 2017

Before RIPPLE, ROVNER, and SYKES, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Lana Canen was convicted of felony
murder on August 10, 2005 in Indiana state court. Over seven
years later, the state postconviction court vacated her convic-
tion after Detective Dennis Chapman, the state's fingerprint
expert, recanted his trial testimony. He conceded that he mis-
takenly had identified a latent fingerprint found at the crime

scene as belonging to Ms. Canen. The misidentification occurred because Detective Chapman only was trained to compare "known prints" (*i.e.*, digital, ink, or powder fingerprint exemplars), not "latent prints" (*i.e.*, invisible, unknown fingerprints found at a crime scene), and thus lacked the necessary qualifications to identify the latent print removed from the crime scene. At no time had he disclosed his lack of training to any party in the underlying state criminal proceeding.

Following her release, Ms. Canen brought this action against Detective Chapman under 42 U.S.C. § 1983.[1] She claimed that he had withheld his lack of qualification to perform latent fingerprint analysis and therefore had violated *Brady v. Maryland*, 373 U.S. 83 (1963). The district court dismissed the case at summary judgment. It held that Detective Chapman was entitled to qualified immunity. Ms. Canen then filed an appeal in this court.[2]

We now hold that the district court's analysis was correct. Detective Chapman's failure to disclose that he was not trained as a latent print examiner cannot be characterized as a violation of any clearly established right, and, accordingly, the doctrine of qualified immunity protects Detective Chapman. Moreover, to the degree that this action is premised on the preparation or presentation of his trial testimony, absolute immunity protects him. Accordingly, we affirm the judgment of the district court.

---

[1] The district court's jurisdiction was premised on 28 U.S.C. §§ 1331, 1343(a)(3).

[2] Our jurisdiction is premised on 28 U.S.C. § 1291.

# I

# BACKGROUND

## A.

On November 28, 2002, Helen Sailor was strangled to death in her apartment. At the time, she was a resident of the Waterfall Highrise Apartments in Elkhart, Indiana, which provided housing for low-income elderly people and adults with disabilities. Lana Canen and Andrew Royer, both recipients of Social Security disability benefits, were also residents.

During the murder investigation, the Elkhart City Police Department ("ECPD") found fingerprints on a number of items in Sailor's apartment, including a plastic container used to hold her medication. The ECPD sent these lifts, along with fingerprint samples from various suspects, to Detective Chapman of the Elkhart County Sheriff's Department for analysis because they knew that the Indiana State Police Laboratory would have required substantially more time to do the analysis. Detective Chapman concluded that the *latent* print on the container matched Ms. Canen's left pinky finger.[3]

As the investigation progressed, the ECPD interviewed Royer about Sailor's murder. Royer made multiple inconsistent statements during his interviews and ultimately confessed to the murder. He was charged with the crime. Some of Royer's statements also implicated Ms. Canen. During her interview, Ms. Canen denied ever being in Sailor's apartment and, even after being told that her fingerprint was found

---

[3] Detective Chapman denies making any representations that he was an expert in latent fingerprint analysis. R.42-2 at 28.

there, continued to deny ever being in the apartment. Subsequently, the prosecutor also charged Ms. Canen in connection with Sailor's murder.

Prior to her trial, the State allowed Ms. Canen's attorney to review the prosecutor's entire file, including Detective Chapman's report. To aid in her evaluation, Ms. Canen's attorney retained Charles Lambdin, a retired ECPD detective, to analyze the latent print. He examined the print for approximately thirty minutes and found two points of similarity, but no points of difference. As a result of his examination, Mr. Lambdin believed that Ms. Canen was possibly the source of the print. Ms. Canen's attorney did not seek a pretrial deposition of Detective Chapman, nor did he move to exclude his testimony.

## B.

At trial, the State's evidence against Ms. Canen focused on testimony regarding her relationship with Royer, her false statement that she was out of town on the day of Sailor's murder, her denial of ever having been inside Sailor's apartment, and Detective Chapman's latent print identification.

Detective Chapman's testimony included a discussion of his prior experience with fingerprint examinations. He described his past experience with the FBI and his participation in a twelve-week FBI training program in which he had learned how to classify and examine fingerprints. He also stated that he was assigned to the Elkhart County Sheriff's Department Crime Laboratory after attending the Integrated Indiana Law Enforcement Crime Scene Training School in the fall of 2000. Additionally, he testified:

Q: … And in the lab as a full time detective technician, is it one of your responsibilities to examine as well [as] compare fingerprints?

A: Yes, it is.

Q: Based upon your experience, have you been able to make fingerprint comparisons in the past several years?

A: Yes, I have.

Q: Any idea how many comparisons you've made?

A: *Not right off the top of my head. Several — maybe 100 or so*.

Q: … Do you also have training and experience in attempting to recover latent prints from a crime scene?

A: Yes.

Q: Is that part of your responsibilities at the sheriff's department?

A: Yes, it is.[4]

Detective Chapman then explained how he compared Ms. Canen's known print card to the latent print taken from Sailor's apartment and stated that the latent print matched Ms. Canen's known print. On cross-examination, Ms. Canen's attorney did not question Detective Chapman

---

[4] R.30-1 at 132–33 (emphasis added).

about his qualifications, nor did he offer a witness to refute his conclusion.

The jury convicted both Ms. Canen and Royer. The court imposed a fifty-five year sentence on Ms. Canen. The Indiana Court of Appeals affirmed her conviction on direct appeal,[5] and the Indiana Supreme Court denied transfer.[6]

## C.

In August 2009, after exhausting her direct appeals, Ms. Canen filed a petition for state postconviction relief ("PCR").[7] As part of her PCR, Ms. Canen's attorney retained an expert, Kathleen Bright-Birnbaum, to analyze the fingerprint evidence. Ms. Bright-Birnbaum is certified in latent fingerprint examination, and her review excluded Ms. Canen as the source of the fingerprint.

Detective Chapman re-examined the evidence and also concluded that he had erred in his previous finding. He testified as to this conclusion during the PCR hearing. When asked why his opinion had changed, he stated that "part of it" was additional training on latent fingerprint identification received in 2006 (after Ms. Canen's trial).[8] He also stated that he had more experience "[l]ooking at a lot of prints" since he

---

[5] R.30-3 at 2.

[6] *Id.*; *Canen v. State*, 860 N.E.2d 591 (Ind. 2006).

[7] Indiana Post-Conviction Relief Rule 1.

[8] R.30-2 at 29; *see also id.* at 22.

conducted the initial analysis.[9] Detective Chapman explained that when he had testified at trial about his experience, he was referring to his experience with "known" or "inked" prints.[10] He simply had not reviewed as many latent prints as suggested by his initial testimony.[11] When asked if he ever considered saying "maybe [he] shouldn't" do the comparison, Detective Chapman testified, "Yes."[12] Nonetheless, he explained that he did not bring this to someone's attention because he "was trying to help out Elkhart City."[13]

The State then requested a continuance in the PCR proceeding to allow the Indiana State Police Laboratory ("State Police") to examine the fingerprint evidence. The State Police excluded Ms. Canen as the source of the latent print. The court then granted Ms. Canen's PCR petition; it concluded that Ms. Canen's exclusion as the source of the latent print constituted newly discovered evidence. Her conviction was vacated.[14] She was released after over seven years of confinement.[15]

---

[9] *Id.* at 29.

[10] *Id.* at 32–33.

[11] *Compare* R.30-1 at 132, *with* R.30-2 at 32–33.

[12] R.30-2 at 33.

[13] *Id.*

[14] R.30-3 at 8.

[15] *See id.*

## D.

In this subsequent civil action in the federal district court, Ms. Canen sought money damages. Her complaint under 42 U.S.C. § 1983 alleged that Detective Chapman had violated her right to due process under *Brady v. Maryland*, 373 U.S. 83 (1963), when he held himself out as an expert in fingerprint identification but failed to inform anyone that he lacked the qualifications necessary to examine latent fingerprints.

On cross-motions for summary judgment, the district court granted judgment in favor of Detective Chapman. The court expressed "doubts" as to whether Detective Chapman's inexperience was "suppressed for purposes of *Brady*" because the evidence was potentially "available to [Ms.] Canen through the exercise of reasonable diligence."[16] The district court did not resolve that issue, however, because it believed that, in any event, Detective Chapman was immune from suit.

The district court based its determination of immunity on two grounds. First, the district court noted that Detective Chapman enjoyed absolute immunity for his allegedly misleading testimony that he had made "maybe 100 or so" fingerprint comparisons.[17] The court also held that Detective Chapman was entitled to qualified immunity. In this respect, the court focused its analysis on the second prong of the qualified immunity test: whether the constitutional right was clearly established at the time of the alleged violation. Specifically, the court held that Ms. Canen had failed to establish

---

[16] R.62 at 21.

[17] *Id.* at 22 n.6.

"whether the violative nature of [Chapman's] *particular* con-
duct is clearly established."[18]

## II

## DISCUSSION

We review a district court's decision granting summary
judgment de novo. *McDonald v. Hardy*, 821 F.3d 882, 888 (7th
Cir. 2016). "Summary judgment is appropriate when, after
construing the record in the light most favorable to the non-
moving party, we conclude that no reasonable jury could rule
in favor of the nonmoving party." *Bagwe v. Sedgwick Claims
Mgmt. Servs.*, 811 F.3d 866, 879 (7th Cir. 2016).

## A.

We first examine whether Detective Chapman is entitled
to qualified immunity. "Qualified immunity shields federal
and state officials from money damages unless a plaintiff
pleads facts showing (1) that the official violated a statutory
or constitutional right, *and* (2) that the right was 'clearly es-
tablished' at the time of the challenged conduct." *Ashcroft v.
al-Kidd*, 563 U.S. 731, 735 (2011) (emphasis added). The district
court declined to answer definitively the first inquiry and fo-
cused on the second. In doing so, the court acted well within
its discretion. *See id.* (explaining that courts may address the
prongs in either order).

---

[18] *Id.* at 25 (emphasis and alteration in original) (internal quotation marks
omitted) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)).

For a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (internal quotation marks omitted) (quoting *al-Kidd*, 563 U.S. at 741). In order to carry that burden, Ms. Canen must "show either a reasonably analogous case that has both articulated the right at issue and applied it to a factual circumstance similar to the one at hand or that the violation was so obvious that a reasonable person necessarily would have recognized it as a violation of the law." *Chan v. Wodnicki*, 123 F.3d 1005, 1008 (7th Cir. 1997). Because the inquiry is aimed at determining whether a reasonable person in the officer's position would have understood his actions to be against the law at the time he acted, the Supreme Court has stressed that the right at issue must be articulated at a meaningful level of particularity. *White v. Pauly*, No. 16-67, slip op. at 6 (U.S. Jan. 9, 2017). This requirement does not mean that a plaintiff must be able to point to a case "on all fours" with the defendant officer's alleged misconduct. But there must be settled authority that would cause him to understand the illegality of the action. *See Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015).

Ms. Canen notes that the right that she asserts here is rooted in *Brady v. Maryland*, 373 U.S. 83 (1963). There, the Supreme Court established the general proposition that a prosecutor's suppression of exculpatory evidence violates the Due Process Clause of the Fourteenth Amendment. Ms. Canen also correctly notes that subsequent case law has established clearly that the *Brady* doctrine applies equally to both exculpatory and impeachment evidence. *Kyles v. Whitley*, 514 U.S. 419, 433 (1995). The mere invocation of these general principles is insufficient. Rather, we must refine our inquiry and examine whether, at the time of Ms. Canen's criminal trial, the

law clearly required someone in Detective Chapman's situation to declare voluntarily his minimal training in evaluating latent finger prints.

In an effort to meet this burden, Ms. Canen invites our attention to *Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001), a case involving exculpatory *Brady* evidence. In *Newsome*, the police failed to alert the prosecutor to the fact that the fingerprints from the crime scene did not match the defendant's. In our analysis, we asked whether it was "clearly established … that police could not withhold from prosecutors exculpatory information about fingerprints" and came to the unremarkable conclusion that, having failed to provide the defense with clearly exculpatory information, the officer could not claim qualified immunity. *Id.* at 752.

*Newsome*, however, cannot carry the day for Ms. Canen. The evidence at issue in this case is of a substantially different kind than the evidence in *Newsome*. In *Newsome*, the suppressed evidence clearly violated *Brady* because it had direct exculpatory value; the fingerprint analysis excluded the defendant as the source of an incriminating fingerprint. By contrast, the right asserted here is of an entirely different ilk; the Detective took the stand and stated his job, his experience, and his conclusions about the latent prints that he was tasked with analyzing. He simply did not disparage his testimony by volunteering that he lacked the training that most witnesses who testify about latent fingerprints have.

Ms. Canen also invites our attention to a number of cases involving *Brady* violations rooted in the suppression of impeachment evidence. We find these cases meaningfully distinguishable for three reasons. First, under the Indiana Rules of Evidence, Detective Chapman's testimony was admissible.

Expert testimony in Indiana is governed by Indiana Rule of
Evidence 702, which states:

>   (a) A witness who is qualified as an expert by
>       knowledge, skill, experience, training, or ed-
>       ucation may testify in the form of an opinion
>       or otherwise if the expert's scientific, tech-
>       nical, or other specialized knowledge will
>       help the trier of fact to understand the evi-
>       dence or to determine a fact in issue.
>
>   (b) Expert scientific testimony is admissible
>       only if the court is satisfied that the expert
>       testimony rests upon reliable scientific prin-
>       ciples.

Ind. R. Evid. 702. The Indiana Supreme Court has clarified
that, under the Indiana Rules of Evidence, "[n]o precise quan-
tum of knowledge is required if the witness shows a sufficient
acquaintance with the subject." *Fox v. State*, 506 N.E.2d 1090,
1095 (Ind. 1987). Rather, "[t]he determination of whether a
witness is qualified to testify as an expert is within the sound
discretion of the trial court whose rulings will not be dis-
turbed absent an abuse of discretion." *Id.* "As such, a witness
may qualify as an expert on the basis of practical experience
alone," *Kubsch v. State*, 784 N.E.2d 905, 921 (Ind. 2003), and
"[a] lack of extensive formal training or experience goes to the
weight of the expert testimony rather than to its admissibil-
ity," *White v. State*, 547 N.E.2d 831, 837 (Ind. 1989). Accord-

ingly, Detective Chapman, an officer trained in known finger-print analysis by the FBI[19] and the Integrated Indiana Law Enforcement Crime Scene Training School,[20] and who had performed latent fingerprint retrieval[21] and latent fingerprint examinations in the past,[22] qualified as an expert under Indiana's rules of evidence and his testimony was admissible.

Second, both the prosecution and defense declined to probe the weight of Detective Chapman's testimony. For example, having established Detective Chapman's qualifications, the first mention of latent prints proceeded as follows:

> Q: Okay. I'd like to show you what has been — actually, before we do that. Let's talk a little bit about fingerprints. Do you also have training and experience in attempting to recover latent prints from a crime scene?
>
> A: Yes.
>
> Q: Is that part of your responsibilities at the sheriff's department?

---

[19] R.36-11 at 2–3.

[20] *Id.* at 5.

[21] R.42-1 at 5 ("Part of my duties as a patrolman included dusting for and retrieving fingerprint impressions from crime scenes.").

[22] *Id.* at 6 ("[F]rom time to time, I was asked to examine latent fingerprints that were taken from a crime scene and compare those fingerprints to 'known prints.'"); *see also* R.42-2 at 27.

A: Yes, it is.[23]

Similarly, Detective Chapman's cross-examination focused on the number of points of comparison needed for a successful match to be established, not his training or experience.[24] At bottom, the prosecution and both defense lawyers elected not to ask Detective Chapman to identify the differences between latent and known fingerprints, or his formal training in one discipline verses the other.

Finally, the cases cited by Ms. Canen all involve disabilities of a very different kind than that presented by the instant facts.[25] For example, in *United States v. Banks*, 546 F.3d 507 (7th Cir. 2008), this Court ordered a new trial when it learned that the chemist who tested the drugs at issue in the case was under investigation for possible misconduct at the time of her trial testimony. *Id.* at 509, 513. Similarly, in *State v. Davila*, 357 P.3d 636 (Wash. 2015), the Washington Supreme Court found that the termination of a DNA specialist for incompetence was favorable impeachment evidence under *Brady*. *Id.* at 638, 643.[26] Finally, in *State v. Proctor*, 595 S.E.2d 476 (S.C. 2004), the Supreme Court of South Carolina found that the trial court had erred in denying the defendant a hearing on his claim that

---

[23] R.30-1 at 133.

[24] *See id.* at 148–51.

[25] We note that these cases are pure *Brady* claims, rather than § 1983 claims arising from a *Brady* violation.

[26] The court declined to find a violation of *Brady* because the suppressed impeachment evidence was not material. *State v. Davila,* 357 P.3d 636, 648–49 (Wash. 2015).

the state suppressed evidence of a DNA lab's error rate.[27] *Id.* at 479.

In marked contrast, Detective Chapman's conduct and background present none of the issues outlined above. He was not under investigation at the time of trial.[28] Moreover, he had not been fired for incompetence, nor is there any indication in the record that he was incompetent. Lastly, there was no evidence that he had a particularly high error rate. Detective Chapman simply had none of the affirmative disabilities outlined in the cases cited by Ms. Canen.

Ultimately, Ms. Canen has pointed us to no case that establishes the legal principle that an officer is obliged to reveal the limitations on his training when he has stated his background, such as it is, and then exposed himself to cross-examination by the defense. We accordingly see no reason to conclude that Detective Chapman's failure to declare affirmatively his lack of training in latent fingerprint evaluation violated any clearly established right.

### B.

To the extent that Ms. Canen's allegation focuses on Detective Chapman's actual testimony and his preparation for

---

[27] The court nonetheless found the nondisclosure was not material. *State v. Proctor*, 595 S.E.2d 476, 480 (S.C. 2004).

[28] Detective Chapman was disciplined and forbidden from assisting other agencies with fingerprint identification only after disavowing his previous fingerprint identification in this case. R.42-2 at 26.

that testimony, he also is protected by the traditional absolute immunity accorded to witnesses at a judicial proceeding.

It is long-established that witnesses enjoy absolute immunity, *Briscoe v. LaHue*, 460 U.S. 325, 330–33 (1983), and we have acknowledged that this protection covers the preparation of testimony as well as its actual delivery in court, *Newsome v. McCabe*, 319 F.3d 301, 304 (7th Cir. 2003). The rule is designed to aid the search for truth by limiting any fear of recrimination, which in turn decreases any attendant motivation to self-censor. *See Briscoe*, 460 U.S. at 332–33.[29]

## Conclusion

The district court correctly granted summary judgment for Detective Chapman. Accordingly, we affirm the judgment of the district court.

AFFIRMED

---

[29] Ms. Canen's invocation of *Manning v. Miller*, 355 F.3d 1028 (7th Cir. 2004), does not alter this rule. That case involved FBI investigators actively colluding with a witness to commit perjury—"behavior that [went] well beyond testimony given at trial." *Id.* at 1032–33.